1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF WASHINGTON
9                                AT TACOMA

10   GMAC, LLC,

11                    Plaintiff,                    CASE NO. C08-5707RJB

12        v.

13   HIATT PONTIAC GMC TRUCKS, INC., a              **ORDER ON GMAC'S MOTION**
     Delaware corporation, STEPHEN A. HIATT,        **FOR PARTIAL SUMMARY**
14   individually, and the marital community        **JUDGMENT, DEFENDANTS'**
     composed of STEPHEN A. HIATT and               **MOTION TO COMPEL AND**
15   JANE DOE HIATT; STEPHEN M. HIATT               **HIATT INDIVIDUAL**
     and JANE DOE HIATT, husband and wife,          **DEFENDANTS' MOTION FOR**
16   and THEA HIATT, individually and the           **SUMMARY JUDGMENT AND**
     marital community composed of THEA             **VARIOUS MOTIONS TO**
17   HIATT and JOHN DOE HIATT,[1]                    **STRIKE**

18                    Defendants.

19
20
21

22        This matter comes before the Court on GMAC LLC's ("GMAC") Motion for Partial

23   Summary Judgment (Dkt. 32), Defendants' Motion to Compel and Rule 56(f) Motion to

24   Continue Summary Judgment Response (Dkt. 33), the Hiatt Individual Defendants' Motion for

25   Summary Judgment (Dkt. 24), and the parties various motions to strike (Dkts. 38, 43, 44, and

26   52).  The Court has considered the pleadings filed in support of and in opposition to the motions

27

28        [1]Parties may wish to amend the caption to reflect this Order.

ORDER
Page 1

1    and the file herein.

2    ## I.    FACTUAL AND PROCEDURAL BACKGROUND

3    **A.    FACTS**

4    Hiatt Pontiac GMC Trucks, Inc. ("Hiatt Pontiac") was incorporated on March 22, 1985.

5    Dkt. 26-2, at 7-18.  Hiatt Pontiac created by-laws (Dkt.26-2, at 19-34) and issued stock to its

6    initial shareholders, Stephen A. Hiatt and General Motors, through Motors Holding Division

7    ("MHD"), (Dkts. 26-2, at 35-38 and 26-3, at 2-3, 39).  In exchange for a start up loan, MHD

8    owned 75% of the stock and Stephen A. Hiatt owned 25% of the stock.  Dkt. 26-2, at 35-38; Dkt.

9    26-3, at 2-3, and Dkt. 25, at 3.  Hiatt Pontiac had corporate directors and officers, (Dkt. 26-2, at

10    39-40), held shareholders and board of directors meetings (Dkt. 26-4, at 2-19), made corporate

11    resolutions (Dkt. 26-4, at 21-32), and submitted state and federal filings (Dkt. 26-5, at 2-23).

12    Hiatt Pontiac filed corporate income tax returns, had bank accounts, kept financial and personnel

13    records, and entered into contracts through its officers.  Dkt. 25, at 3.

14    As a stockholder, MHD had access to Hiatt Pontiac's corporate records.  Dkt. 26-2, at 33.

15    MHD had business practices, policies and procedures that Hiatt Pontiac had to agree to follow.

16    Dkt. 25, at 3.  In 1989, Stephen A. Hiatt bought all MHD's stock and paid off the start up loan.

17    Dkts. 25, at 3- 5, and 26-3, at 71.  Hiatt Pontiac continued to follow most of MHD's established

18    procedures.  Dkt. 25, at 3.  Pursuant to MHD requirements, Hiatt Pontiac set up accounts for

19    employee receivables, referred to as "220 accounts."  Dkt. 25, at 3.  The appropriate 220 account

20    was debited for "any personal expenses or payments advanced by Hiatt Pontiac and the sums

21    would either be deducted from the employee's paycheck or repaid by the employee."  Dkt. 25, at

22    3.

23    1.    *"Floor Plan Financing" with GMAC*

24    In the operation of the dealership, Hiatt Pontiac entered into a financing agreement with

25    GMAC as required by MHD.  Dkt. 29-13, at 7; Dkt. 25, at 4.  Referred to as "floor plan

26    financing," this arrangement was memorialized by the "Wholesale Security Agreement"

27    ("WSA"), and was signed on April 23, 1985, by Stephen A. Hiatt, as President of Hiatt Pontiac,

28

1  and a GMAC representative.  Dkts. 29-2, at 2; 29-13, at 9.  As a new dealer, GMAC additionally

2  required that Stephen A. Hiatt sign a personal guarantee for the flooring line.  Dkt. 25, at 5.

3  GMAC provided floor plan financing for Hiatt Pontiac from 1985 until August of 2008.  Dkt.

4  29-13, at 9.  Under this plan, GMAC would pay GM, American Suzuki, Isuzu Commercial

5  Truck, Nissan Diesel, Hino Motor Sales and other manufacturers for new vehicles on behalf of

6  Hiatt Pontiac, and Hiatt Pontiac would repay GMAC when the new vehicles were sold.  Dkt. 29-

7  13, at 10-11.  Hiatt Pontiac also made a monthly interest payment to GMAC.  Dkt. 29-13, at 11.

8  GMAC eventually provided financing for some, but not all, of Hiatt Pontiac's used cars as well.

9  Dkt. 25, at 16.  The parties do not dispute that GMAC had a secured interest in the cars for

10  which it provided financing.

11        Robert Halcovich, one of GMAC's Portfolio Managers, states that based on his review of

12  GMAC's account records for Hiatt Pontiac, and "based upon [his] understanding of GMAC's

13  typical business practices with respect to dealer-borrowers like Hiatt Pontiac . . . Hiatt Pontiac

14  had repayment obligations for each vehicle it sold that was financed by GMAC."  Dkt. 30, at 3.

15  According to Mr. Halcovich, GMAC required Hiatt Pontiac to pay unpaid balances of any loan

16  with respect to a financed vehicle no later than: "(1) the first business day after receipt by Hiatt

17  Pontiac of a payment for such vehicle or (2) the third business day after delivery by Hiatt Pontiac

18  of a vehicle to a purchaser, whichever comes first."  Dkt. 30, at 3.  "If a vehicle is sold, and the

19  outstanding balance is not paid off as required, the unit is referred to as being 'sold out of trust'

20  or 'SOT.'"  Dkt. 30, at 3.

21        According to Melissa Branham, Hiatt Pontiac's controller, the dealership usually paid off

22  GMAC after Hiatt Pontiac was "funded" by the customer that purchased the vehicle.  Dkt. 29-14,

23  at 4.  Ms. Branham stated that the typical time frame for the "funding source" to pay Hiatt

24  Pontiac was three to five days.  Dkt. 29-14, at 5.  She states that they would then pay GMAC

25  "promptly" after that if they had the cash on hand.  Dkt. 29-14, at 5.  She was aware of GMAC's

26  requirement that they be paid within three business days of a vehicle being sold.  Dkt. 29-14, at

27  9.  Ms. Branham states that there were instances when GMAC was not paid within three business

28

ORDER
Page 3

days of the unit being sold for various reasons. Dkt. 29-14, at 12. She states that, for example, sometimes vehicles would be placed upon a "delayed payment plan," when a customer's funding was delayed. Dkt. 29-14, at 12.

Dean Carpenter, who was the General Manager at Hiatt Pontiac until February of 2008, states that he was also involved in the decision of when Hiatt Pontiac paid GMAC for vehicles. Dkt. 29-15, at 4. He stated that if Hiatt Pontiac's reports showed that "flooring was due" on a particular unit, he would confirm that the vehicle had actually "physically rolled," and then determine when they expected to be "funded." Dkt. 29-15, at 5. He states that he would then check and see if there was enough cash in the Hiatt Pontiac accounts, and then payoff GMAC. *Id.* He states that if there was not enough cash to pay GMAC, then they would not pay the vehicle off that day. *Id.* Mr. Carpenter acknowledges that they tried to pay GMAC off in around three days, but there were times when they had to "drag their feet." *Id.,* at 6.

### 2.    *Credit Cards*

There were credit cards in the name of Hiatt Pontiac, for which several people made charges including, Stephen A. Hiatt, Carol Hiatt (Stephen A. Hiatt's wife), Stephen M. Hiatt (Stephen A. Hiatt's son), Dean Carpenter, and Mark Unsell. Dkt. 25, at 4, and Dkt. 46-17. Stephen A. Hiatt acknowledges that they often charged, to Hiatt Pontiac, meals for business meetings, hotels and plane tickets for conferences, tickets for sporting events and other entertainment to which they took customers. Dkt. 51, at 18-22. Stephen M. Hiatt states that, as an employee of Hiatt Pontiac, he would often take sales associates and other Hiatt Pontiac employees out for lunches to discuss business and would pay with the Hiatt Pontiac credit cards. Dkt. 51, at 35-36. He states that he would charge items at Costco for office barbeques, and various things at Home Depot for the dealership. *Id.* Stephen A. Hiatt acknowledges that he also had personal credit cards. Dkt. 25, at 4. He states that to the extent he or his wife charged personal items on the Hiatt Pontiac cards, the charges were tracked on his 220 account, and repaid, as they were for other employees. Dkt. 25, at 16. Hiatt Pontiac's controller, Melissa Branham, states that personal charges by the Hiatts on the company cards were rare, and

1   confirms that she would charge them to Mr. Hiatt's 220 account.  Dkt. 51, at 44.  Stephen A.

2   Hiatt asserts that GMAC received copies of the financial reports which included the 220

3   accounts.  Dkt. 25, at 4.

4                               3.     *Loans from the Hiatts to Hiatt Pontiac*

5          According to Stephen A. Hiatt, "[d]uring the recession of the 1990's Hiatt Pontiac needed

6   additional working capital and funds to floor it's used vehicles."  Dkt. 25, at 5.  GMAC

7   requested and received a personal guarantee from Stephen A. Hiatt and additional security

8   agreements for additional collateral.  *Id.*  GMAC released the personal guarantee and additional

9   collateral in 1998 after Stephen A. Hiatt personally invested $500,000 and Hiatt Pontiac returned

10  to profitability.  *Id.*

11         In the mid 2000's Hiatt Pontiac experienced declining profits, which became serious

12  losses in 2007.  Dkt. 25, at 5.  Hiatt Pontiac attempted to diversify and added a Suzuki franchise.

13  *Id.*  GMAC provided the $1.5 million to floor the Suzuki line.  *Id.*  In June of 2005, Stephen A.

14  Hiatt and Carol M. Hiatt loaned Hiatt Pontiac $500,000.  *Id.*  This loan was memorialized by a

15  promissory note, and was approved by the board.  *Id.*  The loan was to be repaid in 106 monthly

16  payments, the last payment was to be due in February 2014.  Dkt. 46-7, at 2.  Stephen A. Hiatt

17  does not dispute that on August 15, 2008, he authorized a payoff of the full loan amount.  Dkt.

18  46-13, at 37-38.  GMAC asserts that the Hiatt Pontiac's general ledger shows that $355,571 was

19  used to repay this loan.  Dkt. 46-9, at 4.

20         In May of 2008, Hiatt Pontiac had to lay numerous employees off.  Dkt. 25, at 7.  It was

21  struggling to pay the interest on the GMAC flooring plan, and high fuel costs, and to deal with

22  the significant market downturn.  Dkt. 25, at 9.  Stephen A. Hiatt loaned the dealership another

23  $100,000 at that time to try to ensure a sufficient cash flow.  Dkt. 25, at 5.  On August 11, 2008,

24  the May 2008 loan was noted as a credit on his 220 account.  Dkt. 25, at 5; Dkt. 46-8, at 4.

25                              4.     *Discussions Regarding Sale of the Dealership to GM*

26         Stephen A. Hiatt states that in late May of 2008, he met with Jim Gentry, a GM regional

27  manager.  Dkt. 25, at 7.  Mr. Hiatt states that they discussed his selling Hiatt Pontiac business for

28

1   around three million dollars.  *Id.*  Mr. Hiatt felt that GM wanted him to sell his Pontiac GMC

2   dealership so it could combine those brands with a Buick dealer in the Tacoma area.  *Id.*  Mr.

3   Hiatt states that he signed a proposal and Mr. Gentry took it to GM in Detroit.  *Id.,* at 8.

4        Mr. Hiatt alleges that in late July 2008, he called Mr. Gentry and was told that only one

5   million was available.  *Id.*  After discussing price, Mr. Hiatt states that he was told that final

6   approval was to be given on August 22, 2008.  *Id.*  Mr. Hiatt states that "looking toward the

7   likely sale of the business, [he] authorized Hiatt Pontiac to repay the balance of the June 2005

8   promissory note to [his wife and him] on August 15, 2008, so that the underlying deed of trust on

9   [their] real property would be released to permit [them] to recapitalize Hiatt Pontiac."  *Id.*  He

10  asserts that, "at that time GMAC's proposals included Stephen A. Hiatt personally granting a

11  deed of trust on the property used to secure this note."  *Id.*

12       Mr. Hiatt states that just prior to August 14, 2008, GMAC informed Hiatt Pontiac that it

13  was not going to provide any more financing requests for used vehicles.  Dkt. 39, at 2.

14                    5.    *GMAC's August 14, 2008, Audit*

15       GMAC had the right to perform what the parties refer to as "flooring plan audits."  Dkt.

16  25, at 11.  A "floor plan audit" allowed GMAC to verify that their collateral was still at the

17  dealership and had not been sold.  Dkt. 29-13, at 16.  GMAC would typically check the vehicle

18  identification number ("VIN") on each unit and compare that to their floor plan billing

19  statement.  Dkt. 29-13, at 16.

20       On August 14, 2008, GMAC performed a flooring plan audit at Hiatt Pontiac.  Dkt. 25, at

21  11.  Vehicle titles were separated into two stacks: 1) vehicles floored by GMAC and 2) those not

22  floored by GMAC.  *Id.*  Stephen A. Hiatt states that he informed Don Rice, of GMAC, that there

23  would be more than usual sold and unpaid units than in the past.  Dkt. 25, at 11.  Mr. Hiatt states

24  that Mr. Rice demanded that he sign personal guarantees, an additional security agreement and

25  assignments of account or GMAC would repossess their inventory.  *Id.*  Mr. Hiatt refused.  *Id.*

26  Due to the stress of the situation making his heart condition worse, Stephen A. Hiatt's son,

27  Stephen M. Hiatt, became the dealership's direct contact with GMAC.  Dkt. 25, at 11-13.

28

1    At the conclusion of GMAC's August 2008 audit, GMAC discovered that Hiatt Pontiac

2    had sold 64 vehicles for which Hiatt Pontiac had not paid GMAC. Dkt. 30, at 4. The principal

3    amount of the unpaid debt for these 64 sold vehicles was $1,247,838.81. Dkt. 30, at 5. Robert

4    Halcovich, of GMAC, states that "based upon his review of GMAC's account records for Hiatt

5    Pontiac, and based on [his] understanding of GMAC's typical business practices with respect to

6    dealer-borrowers like Hiatt Pontiac, . . . at the conclusion of the [August 2008 audit] GMAC

7    made demand for payment." Dkt. 45, at 3-4.

8    Stephen A. Hiatt states that the August 2008 audit was very different than other audits

9    GMAC had done in the past. Dkt. 39, at 2. He states that in the past GMAC would provide

10    them a detailed accounting and they would pay GMAC or "conduct follow-up negotiations." *Id.*

11    Moreover, he asserts that in years past, often there was a disparity between the number of

12    vehicles missing from the lot and those for which they had collected payment. Dkt. 39, at 2. He

13    asserts that on other occasions, GMAC would allow them time to "regain possession of a handful

14    of vehicles (referred to in the trade as 'unwind' the deal), and count the vehicle for which no

15    payment had been received as part of the inventory." Dkt. 39, at 2-3. He states that GMAC did

16    not give them any time to respond, like they had in the past. *Id.* He asserts that on this occasion,

17    GMAC sent more auditors than usual, and the auditors took down the serial numbers of "every

18    single car on the lot, including cars belonging to customers and cars taken on consignment." *Id.,*

19    at 3. Mr. Hiatt asserts that GMAC then used this inflated number in its pleadings to the Pierce

20    County Washington Superior Court to get a Temporary Restraining Order ("TRO"), which is

21    discussed in greater detail below. *Id.*

22    According to Stephen A. Hiatt, GMAC never attempted to reconcile non-floored vehicles

23    in prior audits. *Id.* He states that they began to separate the non-floored vehicles from the ones

24    GMAC floored. Dkt. 25, at 13. Stephen M. Hiatt states that, at his father's request, they

25    eventually moved the some of the vehicles that GMAC did not finance away from the dealership.

26    Dkt. 46-13, at 67. Stephen A. Hiatt states that his focus was "to keep the dealership operational

27    without flooring and be able to sell some or all of [their] franchises." Dkt. 25, at 13. He states

28

ORDER
Page 7

that under his dealership agreements and Washington law, manufacturers could terminate him if he is closed for seven consecutive days without paying any reimbursement. *Id.*

### 6.    *Post Audit Events*

On August 18, 2008, GM froze Hiatt Pontiac's "open account." Dkt. 39, at 5. The "open account is a clearing account through which all funds due either to GM or Hiatt Pontiac flow." Dkt. 39, at 5. Stephen A. Hiatt asserts that rather than pay Hiatt Pontiac funds GM owed it, "the funds were diverted for the benefit of GMAC." Dkt. 39, at 5.

Hiatt Pontiac surrendered possession of the vehicles financed by GMAC beginning on August 19, 2008. Dkt. 45, at 5. As of the end of August 2008, Hiatt Pontiac owed GMAC a total of $11,835,628.69 in principal for new and used vehicles. Dkt. 29-4, at 2.

According to Stephen A. Hiatt, on August 22, 2008, the same day the final approval was to be given for the sale of the dealership, GM reduced the offer to $200,000 and set a deadline of noon on August 28, 2008, for Hiatt Pontiac's acceptance. Dkt. 25, at 8. Stephen A. Hiatt states that "the offer included complete releases for GM and its affiliates, which included GMAC." Dkt. 25, at 8. Mr. Hiatt states that he made a counteroffer of one million, which included releases for all parties, and an assignment of one million to GMAC to cover the sold and unpaid units. *Id.*, at 8-9. GM did not accept.

GMAC asserts that on August 28, 2008, $231,031.97 was withdrawn from the dealership's operating account in the form of cashier's checks. Dkt. 46-11, at 5. Stephen A. Hiatt acknowledges that he approved many payments that day including payroll, payroll taxes, insurance, credit cards, gas, rent owed himself, and the following payments:

- $35,064.58  to himself, representing three months salary in advance in order to wind down the business;
- $30,000 to Stephen M. Hiatt, representing three months salary in advance;
- $21,000 to Melissa A. Branham, Hiatt Pontiac's Controller, representing three months salary in advance;
- $15,000 to Tami Hiatt, representing salary to help wind down the business;

1  •   $63,485.77 to Pierce County representing one year of real estate taxes paid in advance;

2  Dkt. 26-6, at 13-14; Dkt. 51, at 42.

3  In the afternoon of August 28, 2008, at the urging of GM and GMAC, the Pierce County,

4  Washington Superior Court entered a TRO, referenced above, against Hiatt Pontiac.  Dkt. 31-2,

5  at 3.  The TRO provides that "[p]ursuant to a Wholesale Security Agreement, and amendments

6  thereto, [Hiatt Pontiac] granted to GMAC a security agreement in new and used motor vehicle

7  inventory, and proceeds thereof."  Dkt. 31-2, at 4.  The TRO prohibits Hiatt Pontiac, in relevant

8  part, from making any "additional sales, transfers, or distributions of any of its new or used

9  motor vehicle inventory, " and "without GMAC's express written consent, making any transfer,

10 withdrawal, or distribution" from Hiatt Pontiac's general operating bank account.  *Id.*, at 5-6.  On

11 September 10, 2008, an Order for Preliminary Injunction, with similar provisions, was entered in

12 Pierce County Washington Superior Court.  Dkt. 31-3, at 3.

13 According to Stephen A. Hiatt, he made and approved the payments before entry of the

14 TRO and before he was even served a copy of it.  Dkt. 25, at 17.  He states that there are

15 numerous unpaid creditors, in addition to GMAC.  Dkt. 25, at 18.  He also states that GMAC did

16 not make a demand for payment for non-floored vehicles before they obtained the TRO on

17 August 28, 2008.  Dkt. 25, at 17.  He states that the county returned $33,890.51, representing

18 property taxes for January 1-June 30, 2009, because it was early, and those funds were used for

19 other business expenses.  Dkt. 53, at 3.

20 In September of 2008, Hiatt Pontiac and GMAC entered into an "Agreement Regarding

21 Disposition of Collateral."  Dkt. 46-12, at 2.  GMAC states that it sold the vehicles it repossessed

22 back to the manufacturers when it could, at private dealer auctions, online through

23 "SmartAuction," and directly to third parties.  Dkt. 45, at 6-7.  GMAC asserts that after

24 disposing of the collateral, there is still a total deficiency of $3,859,037.42 owed by Hiatt Pontiac

25 on the amount financed by GMAC.  Dkt. 45, at 7.  GMAC asserts that Hiatt Pontiac also owes it

26 $345,252.03 in interest and $111,649.71 for costs incurred in connection with the disposition of

27 the collateral.  *Id.* GM terminated Hiatt Pontiac GMC's dealership contract effective October 13,

28

1  2008, and awarded Gilchrist Buick its Pontiac GMC business on October 31, 2008.  Dkt. 24, at

2  14.

3          Defendant Thea Hiatt, Steven M. Hiatt's wife, was never an employee, shareholder,

4  director or corporate officer of Hiatt Pontiac.  Dkt. 25, at 18.  According to Stephen A. Hiatt she

5  received no funds from Hiatt Pontiac in 2008.  *Id.*

6          **B.    PROCEDURAL HISTORY**

7          On October 9, 2008, GMAC filed this suit in Pierce County Washington Superior Court,

8  making claims for:  (1) breach of the Wholesale Security Agreement against Hiatt Pontiac, (2)

9  possession of personal property against Hiatt Pontiac, (3) injunctive relief against Hiatt Pontiac,

10 (4) breach of fiduciary duty against Stephen A. Hiatt, (5) tortious interference with a contractual

11 relationship against Stephen A. Hiatt and Stephen M. Hiatt, (6) fraudulent transfer against all

12 Defendants, (7) conspiracy against all Defendants, (8) petition to compel Hiatt Pontiac to collect

13 unlawful distributions, and (9) impose constructive trust against all Defendants.  Dkt. 1-4, at 5-

14 19.  The case was removed on November 24, 2008.  Dkt. 1.

15         Defendants filed an Answer and make counterclaims for: (1) violation of  § 1 of the

16 Sherman Act, 15 U.S.C. § 1, (2) violation of the Washington State Consumer Protection Act

17 ("WCPA"), RCW 19.86.020, (3) violation of the covenant of good faith and fair dealing, and (4)

18 breach of contract.  Dkt. 5.

19         Trial is set for January 25, 2010.  Dkt. 18.

20         **C.    PENDING MOTIONS**

21         GMAC moves for summary judgment on its claims against Hiatt Pontiac for breach of

22 contract and claims against Stephen A. Hiatt for breach of fiduciary duty and fraudulent transfer.

23 Dkt. 32.  GMAC moves for summary dismissal of Hiatt Pontiac's counterclaims of violation of

24 the WCPA, violation of the covenant of good faith and fair dealing, and breach of contract.  *Id.*

25         In addition to filing a response to GMAC's Motion for Partial Summary Judgment,

26 Defendants filed a motion to compel and motion pursuant to Fed. R. Civ. P. 56 (f) regarding

27 GMAC's Motion for Partial Summary Judgment.  Dkts. 33 and 35.  Specifically, Defendants

28

1    seek an order compelling GMAC to answer Interrogatory No. 24 and Request for Production No.

2    28. *Id.* They assert that this discovery will help them respond to the motion for summary

3    dismissal of their WCPA claim. *Id.* Defendants argue that "the heart of this litigation involves

4    the collusion between GMAC and its affiliate GM to force Hiatt Pontiac out of business, thereby

5    achieving GM's long term goal of channeling all of the Buick, Pontiac and GMC brands in

6    Tacoma into one dealer: Gilchrist." *Id.,* at 2.

7        The individual Defendants Stephen A. Hiatt, Carol M. Hiatt, Stephen M. Hiatt, and Thea

8    Hiatt ("Hiatt Individuals") move for summary dismissal of GMAC claims to the extent that

9    GMAC seeks: "1) to pierce the corporate veil and hold Stephen A. Hiatt personally liable for all

10   obligations of Hiatt Pontiac to GMAC;" 2) to hold that Stephen A. Hiatt breached his fiduciary

11   duty; 3) to hold the Hiatts individually liable for payments they received on August 28, 2008;

12   and "4) any attempt to recover based upon some alleged 'conspiracy' among the Hiatt

13   individuals." Dkt. 24, at 3.

14       **D.    ORGANIZATION OF THE OPINION**

15       This opinion will first address the various motions to strike (Dkts. 38, 43, 44 and 52),

16   then address Defendants' Motion Pursuant to Fed. R. Civ. P. 56(f) and Motion to Compel (Dkt.

17   33), then GMAC's Motion for Partial Summary Judgment (Dkt. 32), and lastly the Hiatt

18   Individual Defendants' Motion for Summary Judgment (Dkt. 24).

19                        **II.    DISCUSSION**

20       **A.    MOTIONS TO STRIKE**

21       Western District of Washington Civil Rule of Procedure 7 (e)(2) provides that response

22   briefs to motions for summary judgments are not to exceed twenty-four pages, and reply briefs

23   are not to exceed twelve pages. Local Rule 7(g) requires that "requests to strike material

24   contained in or attached to submissions of opposing parties shall not be presented in a separate

25   motion to strike, but shall instead be included in the responsive brief." The Rule further provides

26   that requests to strike materials contained in or attached to a reply should be done via a surreply,

27   and in accord with the Local Rules.

28

1                    1.    <u>Defendants' Motion to Strike</u>

2       In their response to GMAC's Partial Motion for Summary Judgment, Defendants move to

3 strike the Declaration of Robert Halcovich.  Dkt. 38.  Defendants argue that his declaration

4 should be stricken because it was not signed and because it contains opinions without a factual

5 basis.  *Id.*  Defendants' motion to strike the Declaration of Halcovich (Dkt. 38) should be granted

6 to the extent that it contains testimony without a factual basis, and denied in all other respects.

7 Mr. Halcovich supplemented his Declaration with a signature page.  Dkt. 45.  To the extent that

8 his Declaration contains testimony without a factual basis it was not considered.

9                    2.    <u>GMAC's Motions to Strike</u>

10       GMAC files three separate pleadings entitled "GMAC LLC's Objections to Stephanie

11 Bloomfield's Declaration in Support of Individual Defendants' Motion for Summary Judgment"

12 (Dkt. 44), "GMAC LLC's Objections to Stephen A. Hiatt's Declaration in Support of Individual

13 Defendants' Motion for Summary Judgment" (Dkt. 43), and "GMAC LLC's Objections to the

14 Supplemental Declaration of Stephen A. Hiatt" (Dkt. 52).  These motions appear to be motions

15 to strike.

16       GMAC failed to follow the Local Rules regarding motions to strike and has met or

17 exceeded the page limits for its responses and replies to the motions for summary judgment.  In

18 the interests of reaching the merits of this case, however, the Court will, nevertheless, consider

19 GMAC's motions to strike.

20       "GMAC LLC's Objections to Stephanie Bloomfield's Declaration in Support of

21 Individual Defendants' Motion for Summary Judgment" (Dkt. 44), construed as a motion to

22 strike, should be denied.  Ms. Bloomfield is counsel for the Defendants, and GMAC objects to

23 her declaration in that it attaches several documents, of which she is not the personal custodian.

24 In response, Mr. Hiatt files a pleading stating that he is the custodian of Hiatt Pontiac records

25 and that all the record attached to Ms. Bloomfield's Declaration are authenticated.  Dkt. 53.

26       "GMAC LLC's Objections to Stephen A. Hiatt's Declaration in Support of Individual

27 Defendants' Motion for Summary Judgment" (Dkt. 43), construed as a motion to strike, should

28

1    be granted, in part, and denied in all other respects.  To the extent that the Declaration contained

2    statements for which Stephen A. Hiatt had no personal knowledge, it was not considered.  To the

3    extent that it contained material that was not relevant, those statements were not considered.

4        "GMAC LLC's Objections to the Supplemental Declaration of Stephen A. Hiatt" (Dkt.

5    52) should be granted to the extent that the Declaration contains unauthenticated documents.

6    GMAC's motion should be denied in all other respects.

7        **B.    SUMMARY JUDGMENT - STANDARD**

8        Summary judgment is proper only if the pleadings, depositions, answers to

9    interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

10   genuine issue as to any material fact and the moving party is entitled to judgment as a matter of

11   law.  Fed. R. Civ. P. 56(c).  The moving party is entitled to judgment as a matter of law when the

12   nonmoving party fails to make a sufficient showing on an essential element of a claim in the case

13   on which the nonmoving party has the burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317,

14   323 (1985).  There is no genuine issue of fact for trial where the record, taken as a whole, could

15   not lead a rational trier of fact to find for the non moving party.  *Matsushita Elec. Indus. Co. v.

16   Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific,

17   significant probative evidence, not simply "some metaphysical doubt.");  *See also* Fed. R. Civ. P.

18   56(e).  Conversely, a genuine dispute over a material fact exists if there is sufficient evidence

19   supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions

20   of the truth.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v.

21   Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

22       The determination of the existence of a material fact is often a close question.  The court

23   must consider the substantive evidentiary burden that the nonmoving party must meet at trial –

24   e.g., a preponderance of the evidence in most civil cases.  *Anderson*, 477 U.S. at 254; *T.W. Elec.

25   Serv., Inc.*, 809 F.2d at 630.  The court must resolve any factual issues of controversy in favor of

26   the nonmoving party only when the facts specifically attested by that party contradict facts

27   specifically attested by the moving party.  The nonmoving party may not merely state that it will

28

1  discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial

2  to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*.

3  Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be

4  presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

5  ### C.    DEFENDANTS' FED. R. CIV. P. 56 (f) MOTION AND MOTION TO COMPEL

6

7  Fed. R. Civ. P. 56(f) provides:

8  If a party opposing the motion shows by affidavit that, for specified reasons, it
   cannot present facts essential to justify its opposition, the court may: (1) deny the
   motion; (2) order a continuance to enable affidavits to be obtained, depositions to
9  be taken, or other discovery to be undertaken; or (3) issue any other just order.

10  To prevail under this Rule, parties opposing a motion for summary judgment must make "(a) a

11  timely application which (b) specifically identifies (c) relevant information, (d) where there is

12  some basis for believing that the information sought actually exists." *Blough v. Holland Realty*

13  *Inc.*, 574 F.3d 1084, 1091(9th Cir. 2009)*(citing Employers Teamsters Local Nos. 175 and 505*

14  *Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129-30 (9th Cir.2004)).  The burden is on

15  the party seeking additional discovery to proffer sufficient facts to show that the evidence sought

16  exists, and that the additional evidence would prevent summary judgment. *Id.*  (*citing Chance v.*

17  *Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1161 n. 6 (9th Cir.2001)).

18      GMAC moves, in part, for summary dismissal of Hiatt Pontiac's WCPA claim against it.

19  Dkt. 32.  Defendants make a motion under Fed. R. Civ. P. 56 (f).  Dkts. 33 and 35.  Defendants

20  allege that their WCPA claim parallels their Sherman Act claim, and point out that GMAC does

21  not move for dismissal of the federal antitrust claim. Dkt. 38, at 24-25.  Defendants further seek

22  an order compelling GMAC to answer Interrogatory No. 24 and Request for Production No. 28.

23  Dkts. 33 and 35.  Interrogatory No. 24 and Request for Production No. 28 seek information

24  about GMAC's internal communications regarding Hiatt Pontiac for 2006-2008.  Dkt. 34, at 37.

25  Defendants argue that "the heart of this litigation involves the collusion between GMAC and its

26  affiliate GM to force Hiatt Pontiac out of business, thereby achieving GM's long term goal of

27  channeling all of the Buick, Pontiac and GMC brands in Tacoma into one dealer:  Gilchrist."

28

1    Dkt. 35, at 2.

2         Typically, "[t]o state a prima facie claim under the WCPA, a plaintiff must establish five

3    distinct elements:  (1) unfair or deceptive act or practice; (2) occurring in trade or commerce; (3)

4    public interest impact; (4) injury to plaintiff in his or her business or property; (5) causation."

5    *Ambach v. French*, 216 P.3d 405, 407 (2009)(*internal citations omitted*).  The WCPA has been

6    held to be coextensive with the Sherman Antitrust Act (15 U.S.C.), and courts look to federal

7    law for guidance in deciding cases in this area.  *See State v. Black*, 100 Wn.2d 793, 799-800

8    (1984).  To establish a claim for attempted monopolization in violation of WCPA and its federal

9    equivalent, 15 U.S.C. § 2, the claimant must prove: "(1) specific intent to control prices or

10   destroy competition, (2) predatory or anticompetitive conduct to accomplish the monopolization,

11   (3) a dangerous probability of success, and (4) causal antitrust injury."  *Forsyth v. Humana, Inc.*,

12   114 F.3d 1467, 1477 (9th Cir.1997).

13        Defendants argue that their WCPA claim, which is coextensive with their Sherman Act

14   claim, is based on the following facts:

15        GMAC instituted audit proceedings and conducted them in a manner inconsistent
          with prior audits which were calculated to make resolution of any issues raised by
16        the audit impossible, allowing GMAC to seize the inventory and assets of the
          Hiatt Pontiac GMAC dealership for the purpose and effect of achieving GM's
17        channeling goals, destroying the business of Hiatt Pontiac GMAC, and
          minimizing or eliminating competition for the sale of GM products in the Pierce
18        County area.

19   Dkt. 38, at 25.  GMAC does not address any of the elements of the Sherman Act claim.

20        Defendants' motion pursuant to Fed. R. Civ. P. 56 (f) (Dkts. 33 and 35) should be granted

21   as to GMAC's motion to summarily dismiss Defendants' WCPA claim, and denied as to the

22   remaining issues raised in GMAC's motion.  Defendants sufficiently identify relevant

23   information and show that there is some basis for believing that the information sought actually

24   exists.  GMAC's motion for summary dismissal of Defendants' WCPA claim (Dkt. 32) should

25   be denied without prejudice.

26        Further, Defendants' Motion to Compel (Dkts. 33 and 35) should be granted and GMAC

27   should be compelled to answer Interrogatory No. 24 and Request for Production No. 28 to the

28

ORDER
Page 15

1    extent that it has not already done so.  Although the Court acknowledges that this motion did not

2    follow the deadline in the scheduling order, in the interest of fully and fairly reaching the merits

3    of this case, these discovery requests should be more fully answered.  Further, parties are

4    strongly encouraged to resolve discovery issues, if possible, without court intervention.

5    ### D.    GMAC'S MOTION FOR SUMMARY JUDGEMENT

6    As a federal court sitting in diversity, this court is bound to apply state law.  *State Farm*

7    *Fire and Casualty Co. v. Smith*, 907 F.2d 900, 901 (9th Cir. 1990).  This section (II. D.) of the

8    opinion will be organized according to claim.  GMAC moves for summary judgment on its

9    breach of contract claim, breach of fiduciary duty claim, and fraudulent transfer claim.  Dkt. 32.

10   It also moves for summary dismissal of Defendants' WCPA, breach of contract, and breach of

11   the covenant of good faith and fair dealing claims.  *Id.*

12   ### 1.    <u>GMAC's Breach of Contract Claim Against Hiatt Pontiac</u>

13   The elements of a breach of contract claim in Washington are:  1) the existence of a valid

14   contract between the parties, 2) breach by the defendant, and 3) damages.  *See Hearst*

15   *Communications, Inc. v. Seattle Times Co.*, 154 Wash.2d 493 (2005).  Parties do not contest that

16   the WSA constituted a valid contract between the parties.  The parties do contest whether Hiatt

17   Pontiac breached the WSA.  Dkts. 32 and 38.

18   The WSA provided that Hiatt Pontiac agreed "upon demand to pay to GMAC the amount

19   it advances or is obligated to advance to the manufacturer or distributor for each vehicle with

20   interest."  Dkt. 29-2, at 2.  Further, Hiatt Pontiac agreed that "as each vehicle is sold, or leased,

21   [they] will faithfully and promptly remit to [GMAC] the amount [GMAC] advanced."  *Id.*

22   Review of a contract is generally limited to the contract itself, and parol evidence or

23   extrinsic evidence is not admissible to add to, subtract from, vary, or contradict written contracts

24   that are valid, complete, unambiguous, and not affected by accident, fraud, or mistake.  *Berg v.*

25   *Hudesman*, 115 Wn.2d 657, 670 (1990).  The WSA contains an ambiguous term:  "promptly" in

26   relation to when payment was due to GMAC.  Whether Hiatt Pontiac breached the WSA turns on

27   the interpretation of this term.  In the state of Washington, contract interpretation requires the

28

1    court to determine the meaning of a contract term and the parties' intentions.  *Berg v. Hudesman*,

2    115 Wn.2d 657, 663 (1990).  Washington state has adopted the "context rule" and recognized

3    that intent of the contracting parties regarding particular terms cannot be interpreted without

4    examining the context surrounding an instrument's execution.  *Hearst* at 502.  Accordingly,

5    extrinsic evidence may be used to determine the parties' intent and includes:  "(1) the subject

6    matter and objective of the contract, (2) all the circumstances surrounding the making of the

7    contract, (3) the subsequent acts and conduct of the parties, and (4) the reasonableness of

8    respective interpretations urged by the parties."  *Hearst* at 502.  "Surrounding circumstances and

9    other extrinsic evidence are to be used to determine the meaning of specific words and terms

10   used  and not to show an intention independent of the instrument or to vary, contradict or modify

11   the written word."  *Hearst* at 503.

12        GMAC's motion for summary judgment on its breach of contract claim (Dkt. 32) should

13   be denied.  There are issues of fact as to whether Hiatt Pontiac breached the WSA in August of

14   2008 in failing to "promptly" repay GMAC.  Although GMAC argues that the term "promptly"

15   meant that they were to be paid within three days of a vehicle being sold, there is evidence in the

16   record, if believed by a trier of fact, that the Hiatt Pontiac reimbursed GMAC for cars it sold

17   over a varying range of time.  Dkt. 29-14, at 4-12; Dkt. 29-15, at 4-6; Dkt. 39, at 2.  There is

18   evidence that prior audits showed that Hiatt Pontiac had sold vehicles for which it had not repaid

19   GMAC, and that GMAC would provide them a detailed accounting, and the parties would

20   "conduct follow-up negotiations."  Dkt. 39, at 2.  There is evidence that GMAC would give the

21   dealership time to regain possession of vehicles for which the customer had not paid.  Dkt. 29-

22   15, at 4-6; Dkt. 39, at 2.  Moreover, to the extent that GMAC seeks summary judgment on its

23   breach of contract claim for the difference between what GMAC sold the new and used vehicles

24   for and what Hiatt Pontiac owes GMAC, the motion should be denied.  There are issues of fact

25   as to whether GMAC created the situation which forced Hiatt Pontiac to be unable to pay them.

26   *See Reynolds Metals Co. v. Electric Smith Const. & Equip.*, 4 Wn. App. 695, 699 (1971) (a party

27   may not recover for breach of contract for delay in performance where that party is the

28

ORDER
Page 17

1    proximate cause of the delay).  Viewed from the Defendants' perspective, the evidence is that

2    GMAC conducted the audit, failed to allow the dealership to respond in the customary manner,

3    and then quickly seized a majority of the vehicles, preventing the dealership from having any

4    hope of meeting its' obligations under the WSA.  GMAC's contention that Defendants raise the

5    same evidence as a part of their counterclaim for breach of the covenant of good faith and fair

6    dealing does not alter the fact that there are issues of fact as to whether GMAC created the

7    situation causing Hiatt Pontiac's inability to pay them.  Accordingly, GMAC's motion for

8    summary judgment on its claim for breach of contract (Dkt. 32) should be denied.

9                    2.    GMAC's Breach of Fiduciary Duty Claim Against Stephen A. Hiatt

10           GMAC alleges that its' fourth claim for breach of fiduciary duty against Stephen A. Hiatt

11   is based on his decision to pay himself and others corporate assets after Hiatt Pontiac became

12   insolvent to the detriment of the corporation's lawful creditors.  Dkt. 32, at 19.  GMAC moves

13   for summary judgment on its breach of fiduciary duty claim against Stephen A. Hiatt (Dkt. 32),

14   and the Defendants file a cross motion to dismiss this claim (Dkts. 24 and 38).

15           In order to establish liability for breach of fiduciary duty, the GMAC bears the burden of

16   showing that Stephen A. Hiatt breached his fiduciary duty to GMAC and that the breach was a

17   proximate cause of the losses sustained.  *Senn v. Northwest Underwriters, Inc*., 74 Wash. App.

18   408, 414 (Wash. Ct. App. 1994).  Stephen A. Hiatt contends that he did not have a fiduciary duty

19   to GMAC, but to Hiatt Pontiac.  Dkt. 38, at 15.  GMAC argues that under the "trust fund"

20   doctrine, Stephen A. Hiatt, as a corporate officer, owed a fiduciary duty to Hiatt Pontiac's

21   creditors once Hiatt Pontiac became insolvent.  Dkt. 32, at 19.

22           "Prior to 1931, this state followed the 'trust fund' doctrine which holds that upon

23   insolvency the corporate assets become a trust fund and corporate officers and directors owe the

24   creditors a fiduciary duty to preserve and equitably distribute these assets."  *Block v. Olympic

25   Health Spa, Inc*., 24 Wash. App. 938, 948 (Wash. App. 1979).  Under the trust fund doctrine

26   such preferential transfers were void or voidable.  *Id.*  In 1931, the Washington Legislature

27   codified the doctrine, but limited its' application, and then in 1941 further amended the "trust

28

1    fund" doctrine under RCW 23.72.030.  *Id.*  In 2004, the law was repealed, and the act was not

2    replaced.  RCW 23.72.030, repealed, laws 2004, ch. 165, § 47.

3         Even assuming that the common law "trust fund doctrine" has been revived after the

4    legislature repealed the statute, GMAC's motion for summary judgment on its claim for breach

5    of fiduciary duty should be denied.  First, there are issues of fact as to whether Hiatt Pontiac was

6    insolvent when the transfers to Stephen A. Hiatt were made, particularly those in early August.

7    Moreover, Washington courts have permitted preferential payments to corporate officers during

8    insolvency provided the transfer could withstand close scrutiny and is shown to have been both

9    fair and equitable and not such as to constitute a fraud on creditors.  *Tacoma Ass'n of Credit Men*

10   *v. Lester*, 72 Wash.2d 453 (1967); *Block v. Olympic Health Spa, Inc*., 24 Wash. App. 938, 949

11   (Wash. App. 1979).  There are issues of fact as to whether the transfers to Stephen A. Hiatt

12   "could withstand close scrutiny" were "fair and equitable" and did not "constitute a fraud on

13   creditors."

14        Both GMAC's motion for summary judgment on its breach of fiduciary duty claim

15   against Stephen A. Hiatt (Dkt. 32) and the Defendant's cross motion for summary dismissal of

16   this claim (Dkts. 24 and 38) should be denied.

17                    3.    GMAC's Claim for Fraudulent Transfer

18        GMAC moves for summary judgment on its fraudulent transfer claim, arguing that the

19   claim is based on Stephen A. Hiatt's deliberate diversion of corporate assets intended to hinder

20   GMAC from collecting on Hiatt Pontiac's debt.  Dkt. 32, at 23.

21        Washington's Uniform Fraudulent Transfer Act provides that a transfer may be

22   fraudulent if:  1) it is made "[w]ith actual intent to hinder, delay, or defraud any creditor of the

23   debtor," or 2) it is made "[w]ithout receiving a reasonable equivalent value in exchange for the

24   transfer."  RCW 19.40.041(a)(1)- (2).  In determining actual intent under subsection (a)(1),

25   consideration may be given, among other factors, to whether:

26        (1) The transfer or obligation was to an insider; (2) The debtor retained
          possession or control of the property transferred after the transfer; (3) The transfer
27        or obligation was disclosed or concealed; (4) Before the transfer was made or
          obligation was incurred, the debtor had been sued or threatened with suit; (5) The

28

transfer was of substantially all the debtor's assets; (6) The debtor absconded; (7) The debtor removed or concealed assets; (8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and (11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

RCW 19.40.041(b).

GMAC's motion for summary judgment on its fraudulent transfer claim (Dkt. 32) should be denied. There are issues of fact as to whether the transfers Stephen A. Hiatt approved in August of 2008 were made with the "actual intent to hinder, delay, or defraud" GMAC. First, not all transfers were to insiders. Mr. Hiatt approved payments for payroll, utility bills, credit cards and gasoline. Dkt. 26-6, at 13-14; Dkt. 51, at 42. As above, there are issues of fact as to whether the dealership was insolvent. Even assuming that Hiatt Pontiac was insolvent, a debtor may prefer one or more creditors over others. *Public utility District No. 1 of Lewis County v. Washington Public Power Supply System,* 104 Wn.2d 353, 379 (1985). Under RCW 19.40.081(f) a transfer to an insider is not voidable where 1) the insider gave new value, 2) if made in the ordinary course of business, or 3) was made in a good faith effort to rehabilitate the debtor. Defendants point to the fact that the salary payments to Stephen A. Hiatt and Stephen M. Hiatt were for salary already earned and three months of salary in advance to wind down the business. Dkt. 26-6, at 13-14; Dkt. 51, at 42. Defendants argue that the transfers to payoff loans were made in good faith in an effort to rehabilitate the business. Dkt. 38. Mr. Hiatt states that "looking toward the likely sale of the business, [he] authorized Hiatt Pontiac to repay the balance of the June 2005 promissory note to [his wife and him] on August 15, 2008, so that the underlying deed of trust on [their] real property would be released to permit [them] to recapitalize Hiatt Pontiac." Dkt. 39. He states that he was attempting to acquire other financing for the dealership. *Id.* There is no evidence that Hiatt Pontiac or Mr. Hiatt attempted to conceal the payments. Viewing the evidence in a light most favorable to the Defendants, GMAC's motion for summary judgment on its claim for fraudulent transfer (Dkt. 32) should be denied.

/

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

        4.     <u>Hiatt Pontiac's WCPA Claim Against GMAC</u>

As discussed in Section II. B., "Defendants Motion Pursuant to Fed. R. Civ. P. 56 (f) and Motion to Compel, GMAC's motion to summarily dismiss Hiatt Pontiac's WCPA claim should be denied without prejudice.

        5.     <u>Hiatt Pontiac's Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing Claims Against GMAC</u>

GMAC moves for summary dismissal of Hiatt Pontiac's breach of contract and breach of the duty of good faith and fair dealing claims. Dkt. 32. Hiatt Pontiac argues that under the September 2008 Collateral Disposition Agreement, GMAC expressly promised that it would not return vehicles under Hiatt Pontiac's contract with GM. Dkt. 38. The September 2008 Collateral Disposition Agreement provided, in relevant part,

> Without limitation, either of the following constitutes a commercially reasonable disposition of the Collateral: If available, the sale or return of motor vehicles to the manufacturer thereof under a repurchase or similar type of agreement, even if it results in a deficiency, provided however no motor vehicles shall be returned under the Hiatt dealer contract with GM.

Dkt. 46-12, at 2. Hiatt Pontiac states that it received "charge backs" in its open account with GM. Dkt. 39, at 5. Hiatt Pontiac argues that these charges show that GMAC had, in fact, returned the vehicles to GM under the Hiatt dealer contract. *Id*., at 5-6. There are issues of fact as to whether GMAC breached the agreement not to return vehicles under the Hiatt Pontiac's dealer contract with GM and whether it violated the covenants of good faith and fair dealing. GMAC's motion to summarily dismiss Hiatt Pontiac's claims for breach of contract and breach of the duty of good faith and fair dealing (Dkt. 32) should be denied.

    **E.    INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Hiatt Individual Defendants move for dismissal of GMAC's claims pursuant to Fed. R. Civ. P. 56, arguing:  1) to the extent that GMAC intends to hold the Stephen A. Hiatt personally liable, the corporate form should be respected because GMAC has no evidence of exceptional circumstances that would justify piercing the corporate veil, 2) there is no evidence to support GMAC's breach of fiduciary duty claim, 3) Stephen A. Hiatt's actions with respect to

1  Hiatt Pontiac's contracts with GMAC were all in his capacity as President of Hiatt Pontiac and

2  were privileged and so there is no evidence of tortious interference with a business expectancy,

3  4) the evidence doe not support any fraudulent transfers to the Hiatt individuals, and 5) Stephen

4  A. Hiatt alone made decisions as to payment and there is no evidence of any conspiracy among

5  the defendants.  Dkt. 24.

6                          1.    Piercing the Corporate Veil

7         "A corporation exists as an organization distinct from the personality of its shareholders."

8  *Grayson v. Nordic Const. Co., Inc*., 92 Wash.2d 548, 552 (1979).  "Disregarding the corporate

9  form or 'piercing the corporate veil,' is an equitable remedy imposed only in exceptional

10  circumstances."  *Eagle Pacific Ins. Co. v. Christensen Motor Yacht Corp*., 85 Wash.App. 695,

11  708 (Wash. App. 1997).  Washington recognizes two theories to justify piercing the corporate

12  veil.  The first is that "[t]he corporate entity is disregarded and liability assessed against

13  shareholders in the corporation when the corporation has been intentionally used to violate or

14  evade a duty owed to another."  *Meisel v. M & N Modern Hydraulic Press Co.*, 97 Wash.2d 403,

15  409 (1982).  Under the second theory, the "alter ego theory," the corporate veil may be pierced

16  where "the corporate entity has been disregarded by the principals themselves so that there is

17  such a unity of ownership and interest that the separateness of the corporation has ceased to

18  exist."  *Grayson* at 553.  Stephen A. Hiatt had been  Hiatt Pontiac's sole shareholder since

19  December 31, 2007.  Dkt. 29-13, at 4.  In August of 2008, Stephen A. Hiatt was the sole officer

20  of Hiatt Pontiac.  *Id.*

21                          a.    *Corporation Used to Violate or Evade a Duty*

22         There are two elements that must be satisfied to pierce the corporate veil under this

23  theory:  1) "the corporate form must be intentionally used to violate or evade a duty;" 2)

24  "disregard must be necessary and required to prevent unjustified loss to the injured party."

25  *Meisel*, at 410 (*internal citations omitted*).

26         With regard to the first element, an abuse of the corporate form must be found, which

27  typically involves "fraud, misrepresentation, or some form of manipulation of the corporation to

28

ORDER
Page 22

1    the stockholder's benefit and creditor's detriment." *Meisel,* at 410 (*internal citations omitted*).

2    "With regard to the second element, wrongful corporate activities must actually harm the party

3    seeking relief so that disregard is necessary.  Intentional misconduct must be the cause of the

4    harm that is avoided by disregard." *Meisel*, at 410 (*internal citations omitted*).

5        Considering the record as a whole, there are issues of fact as whether an abuse of the

6    corporate form occurred here.  Mr. Hiatt's decisions to pay himself large sums of money while

7    Hiatt Pontiac was in financial difficulty could be considered by a trier of fact to involve "fraud,

8    misrepresentation, or some form of manipulation of the corporation" at GMAC's expense.

9    Accordingly, the Individual Hiatt Defendants' Motion to summarily dismiss GMAC's theory of

10   recovery based upon piercing the corporate veil should be denied.  There are also issues of fact

11   as to whether the wrongful corporate activities, if they did occur, actually harmed GMAC.

12                        b.    *Alter Ego*

13        The Individual Defendants' Motion for Summary Judgment should be denied as to the

14   alter ego theory as well.  There are sufficient issues of fact as to whether "the corporate entity

15   has been disregarded" by Mr. Hiatt so that there is "such a unity of ownership and interest that

16   the separateness of the corporation has ceased to exist." *Grayson* at 553.  Admittedly, Hiatt

17   Pontiac did maintain some corporate formalities, including having a board of directors, (although

18   it is unclear, from the record, who was on the board in August of 2008) and maintaining its own

19   bank accounts, and records.  There is evidence in the record that although the corporate cards

20   were occasionally used for private purchases, those purchases were charged to the 220 accounts.

21   The fact that Stephen A. Hiatt was the only stock holder is also not determinative.  "[A]

22   corporation's separate legal identity is not lost merely because all of its stock is held by members

23   of a single family or by one person," *Grayson* at 553.  However, in August of 2008, Stephen A.

24   Hiatt was the only officer of the company and made final decisions regarding finances.  Dkt. 29-

25   13, at 5.  The evidence in the record, particularly as to the transfers of money to himself in

26   August 2008, could be construed to indicate that the separateness of Hiatt Pontiac and Stephen

27   A. Hiatt ceased to exist.

28

1

2.     <u>GMAC's Claim for Breach Fiduciary Duty Against Stephen A. Hiatt</u>

2       The Hiatt Individual Defendants move for the summary dismissal of GMAC's claim for

3    Breach of Fiduciary Duty. Dkt. 24. As stated in the Discussion section on GMAC's motion for

4    summary judgment on its claim for breach of fiduciary duty (Section II. D. 2.), the Hiatt

5    Individual Defendants' motion to summarily dismiss this claim should be denied.

6       3.     <u>GMAC's Claim for Tortious Interference with Contractual Relationship</u>

7       The Hiatt Individual Defendants move for summary dismissal of GMAC's tortious

8    interference with a contractual relationship claim. Dkt. 24. GMAC states that its claim is based

9    on the fact that Hiatt diverted funds to himself and his family members and removed vehicles

10    from the dealership lot, in order to impair GMAC's right to collect on Hiatt Pontiac's debt. Dkt.

11    42, at 17. In support of its claim regarding the moved vehicles, GMAC points to language in the

12    WSA which provides:

> 13     GMAC is hereby granted a security interest in the vehicles and the proceeds of
> 14     sale thereof ("Collateral") as more fully described herein. The collateral subject
>     to this [WSA] is new vehicles held for sale or lease and used vehicles acquired
> 15     from manufacturers or distributors and held for sale or lease, and all vehicles of
>     like kinds or types now owned or hereafter acquired from manufacturers,
> 16     distributors, or sellers by way of replacement, substitution, addition or otherwise,
>     and all additions and accessions thereto and all proceeds of such vehicles,
>     including insurance proceeds.

17

Dkt. 29-2, at 2.

18       "An action for tortious interference with a contractual relationship lies only against a

19    third party. A party to the contract cannot be liable in tort for inducing its own breach."

20    *Olympic Fish Products, Inc. v. Lloyd*, 93 Wash.2d 596, 598 (1980). "An officer or director of a

21    corporation is not personally liable for inducing the corporation to violate a contractual relation

22    provided the officer or director acts in good faith. Good faith in this context means nothing more

23    than an intent to benefit the corporation." *Id.,* at 599.

24       To the extent that the claim is based upon the diversion of funds, the Hiatt Individual

25    Defendants' motion should be denied. There are issues of fact as to whether Stephen A. Hiatt

26    acted in good faith in regard to the payments he made out of the Hiatt Pontiac accounts the end

27    of August 2008.

28

ORDER
Page 24

To the extent that the claim is based upon the Hiatts' removal of vehicles which GMAC did not finance, the motion should be denied as to Stephen A. Hiatt and granted to as to the remaining Defendants. Although the Hiatts argue that parties' course of dealing demonstrates that GMAC did not have an interest in the nonfloored vehicles, there are issues of fact as to whether Stephen A. Haitt acted in good faith when he ordered the vehicles moved. As to Stephen M. Hiatt, GMAC makes no showing that employees can be held liable when acting at the direction of their employer within the scope of their duties. Accordingly, to the extent that GMAC brings a claim against Stephen M. Hiatt, who was not officer or director, or any of the other individual defendants for tortious interference with a contractual relationship, the claim should be dismissed.

### 4. GMAC's Fraudulent Transfer Claim

As stated in section II. D. 3. above, there are issues of fact as to GMAC's fraudulent transfer claim. The Hiatt Individual Defendants' motion to dismiss this claim (Dkt. 24) should be denied as to Stephen A. Hiatt. Defendants concede that there may be factual issues that preclude summary judgment on these issues as to Stephen A. Hiatt. Dkt. 50, at 13.

The motion should be granted as to Stephen M. Hiatt, Thea Hiatt and Carol Hiatt. GMAC has failed to carry its burden to show that there are issues of fact on the claim for fraudulent transfer as to these three defendants. GMAC's claim for fraudulent transfer against Stephen M. Hiatt, Thea Hiatt and Carol Hiatt should be dismissed.

### 5. GMAC's Conspiracy Claim

In the state of Washington a civil conspiracy is defined as "a combination of two or more persons who contrive to commit a criminal or unlawful act, or to commit a lawful act for criminal or unlawful purposes." *Adams v. King County*, 164 Wash.2d 640, 660 (2008). "In order to establish a conspiracy the plaintiff must show that the alleged coconspirators entered into an agreement to accomplish the object of the conspiracy." *Corbit v. J. I. Case Co.,* 70 Wash.2d 522, 529 (1967). A conspiracy must be proved by clear, cogent, and convincing evidence. *Id*.

ORDER
Page 25

1   The Hiatt Individual Defendants' motion to summarily dismiss GMAC's conspiracy

2   claim (Dkt. 24) should be granted.  GMAC has failed to point to clear, cogent, and convincing

3   evidence that the parties entered into an "agreement to accomplish the object" of a conspiracy.

4   GMAC points to the fact that Stephen A. Hiatt ordered Stephen M. Hiatt to move some of the

5   vehicles GMAC did not finance and that Stephen M. Hiatt, an employee, admits moving those

6   vehicles after GMAC demanded all vehicles be turned over.  GMAC argues that this evidence

7   shows that they had an "agreement."  Dkt. 42.  Contrary to GMAC's urging, this evidence is not

8   sufficient to overcome the high standard required.  GMAC's conspiracy claim should be

9   dismissed.

10   ### III.  ORDER

11   Therefore, it is hereby, **ORDERED** that:

12   • Defendants' Motion to Strike (Dkt. 38) is **GRANTED, IN PART, AND DENIED, IN**

13   **PART,** as stated above;

14   • GMAC's motion to strike the Declaration of Stephanie Bloomfield (Dkt. 44) is

15   **DENIED**;

16   • GMAC's motion to strike Stephen A. Hiatt's Declaration (Dkt. 43) is **GRANTED** in

17   part, as stated above, and **DENIED** in all other respects;

18   • GMAC's motion to strike Stephen A. Hiatt's Supplemental Declaration (Dkt. 52) is

19   **GRANTED** in part, as stated above, and **DENIED** in all other respects;

20   • Defendants' Motion Pursuant to Fed. R. Civ. P. 56(f) (Dkts. 33 and 35) is **GRANTED** as

21   to the Defendants' Washington Consumer Protection Act claim and **DENIED** as to the

22   remaining issues raised in GMAC's Motion for Partial Summary Judgment;

23   • Defendants' Motion to Compel (Dkt. 33 & 35) is **GRANTED,** to the extent that GMAC

24   has not answered Interrogatory No. 24 and Request for Production No. 28; they are now

25   **ORDERED TO DO SO**;

26   • GMAC's Motion for Partial Summary Judgment (Dkt. 32) is:

27   • **DENIED** as to GMAC's claims for breach of contract, breach of fiduciary duty;

28

ORDER
Page 26

1       and fraudulent transfer;

2       •    **DENIED WITHOUT PREJUDICE** as to Defendants' claim under the

3       Washington Consumer Protection Act;

4       •    **DENIED** as to Defendants' claims for breach of contract and breach of the duty

5       of good faith and fair dealing;

6 •    Defendants' cross summary judgment motion for dismissal of GMAC's claim for breach

7     of fiduciary duty (made in both Dkts. 24 and 38) is **DENIED**;

8 •    Hiatt Individual Defendants' Motion for Summary Judgment (Dkt. 24) is:

9       •    **DENIED** as to their motion to dismiss GMAC's theory of recovery based upon

10      piercing the corporate veil;

11      •    **DENIED** as to their motion to dismiss GMAC's tortious interference with a

12      contractual relationship as against Stephen A. Hiatt, and **GRANTED** to the extent

13      that the claim is made against Stephen M. Hiatt;

14      •    GMAC's claim against Stephen M. Hiatt of tortious interference with a

15      contractual relationship is **DISMISSED**;

16      •    **DENIED** as to their motion to dismiss GMAC's fraudulent transfer claim against

17      Stephen A. Hiatt, but is **GRANTED** to the extent that the claim is asserted

18      against Stephen M. Hiatt, Thea Hiatt, and Carol Hiatt;

19      •    GMAC's claim for fraudulent transfer, asserted against Stephen M. Hiatt, Thea

20      Hiatt, and Carol Hiatt is **DISMISSED**;

21      •    **GRANTED** as to their motion to summarily dismiss GMAC's conspiracy claim

22      •    GMAC's conspiracy claim is **DISMISSED**.

23     The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel

24 of record and to any party appearing *pro se* at said party's last known address.

25     DATED this 7th day of December, 2009.

26

27               Robert J. Bryan

                  United States District Judge

28